**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TEXAS CAPITAL BANK, NATIONAL ASSOCIATION,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. 3:08-CV-1186-N** |
| **AMERIPRISE FINANCIAL SERVICES, INC.** | § § § | |
| **Defendant.** | § § | |

_____

**PLAINTIFF TEXAS CAPTIAL BANK, NATIONAL ASSOCIATION'S
BRIEF IN SUPPORT OF ITS RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

_____

Respectfully submitted,

HIGIER ALLEN & LAUTIN, P.C.

By:     _/s/ Stacy R. Welch_____
          Jennifer L. Owen
          State Bar No. 15369050
          Stacy R. Welch
          State Bar No. 24033321

5057 Keller Springs Road, Suite 600
Addison, Texas  75001
Telephone: (972) 716-1888
Telecopy:  (972) 716-1899

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

Table of Contents ...............................................................................................................ii

Table of Authorities ..........................................................................................................iii

I.   Summary.......................................................................................................................1

II.  Procedural Background ...............................................................................................2

III. Factual Background ....................................................................................................3

IV.  Argument and Authorities .........................................................................................4

    A.   The Control Agreement was a valid contract because, as its agent, Jordan possessed authority to act on Defendant's behalf ...................................................4

        1.   Jordan is Defendant's agent because Defendant controlled the details of his work as financial advisor ............................................................................5

            a.   A written contract is not determinative of the parties' relationship where there is evidence of control by the alleged principal ...........................5

            b.   Ameriprise actually controlled the details of Jordan's work, thereby making the Franchise Agreement a subterfuge....................................6

                (i)   Length of Jordan's employment and relationship with Defendant ....................................................................................................7

                (ii)   Defendant's control of the details of Jordan's work and its instructions to its financial advisors in performing their work ....8

        2.   Defendant bestowed actual authority on Jordan, or alternatively, Jordan possessed apparent authority, to act on Defendant's behalf with regard to the Control Agreement.....................................................................................11

            a.   Jordan had actual authority to process requests for the pledge of accounts such as the REIT on Defendant's behalf ...............................................11

            b.   Alternatively, Jordan had apparent authority to process requests for the pledge of accounts such as the REIT on Defendant's behalf ...............11

                (i)   Defendant's affirmative acts creating apparent authority ...........11

                (ii)   Distinctions between the present matter and case law relied upon by Defendant .................................................................................13

B.   Plaintiff sustained monetary damages due to Defendant's breach of the Control Agreement ...........................................................................................................15

V.   Prayer ...................................................................................................................16

## TABLE OF AUTHORITIES

*Am. Energy Serv., Inc. v. Union Pacific Resources Co.*, No. 01-98-01264-CV, 2001 WL 953736 (Tex. App. - Houston [1st Dist.] Aug. 16, 2001) ....................................................................5

*Arguello v. Conoco, Inc.*, 207 F.3d 803 (5th Cir. 2000) ..........................................................5, 8, 9

*Bell v. VPSI, Inc.*, 205 S.W.3d 706 (Tex. App. - Fort Worth 2006, no pet. h.) .......................5, 8, 9

*Cardinal Health Solutions v. Valley Baptist Medical Ctr.*, 643 F.Supp.2d 883 (S.D. Tex. 1981) ..................................................................................................................................7, 8, 9, 10

*Emtel, Inc. v. Lipidlabs, Inc.*, 583 F.Supp. 811 (S.D. Tex. 2008) ..............................................10

*Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903 (Tex. App. - Fort Worth 2009, pet. denied) ....................................................................................................................6, 11

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) ......................................................................13, 14

*Granger v. Tealstone Contractors, L.P.*, No. 05-04-00636-CV, 2005 WL 565098 (Tex. App. - Dallas March 11, 2005) ....................................................................................................5

*Ochoa v. J&H Truck Serv., Inc.*, No. Civ. A. 3:97-CV-1998G, 1999 WL 729252 (N.D. Tex. Sept. 15, 1999) ....................................................................................................................5

*Newspapers, Inc. v. Love*, 380 S.W.2d 582 (Tex. 1964) ........................................................6, 11

*Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345 (5th Cir. 2001) .......5, 6

*Ross v. Texas One Partnership*, 796 S.W.2d 206 (Tex. App. - Dallas 1990, writ denied) .......6, 7, 11

*Smith v. Foodmaker, Inc.*, 928 S.W.2d 683 (Tex. App. - Fort Worth 1996, no pet. h.) ..........5

**COMES NOW**, Plaintiff Texas Capital Bank National Association ("Plaintiff"), and files this, its Brief in Support of its Response to Defendant Ameriprise Financial Services, Inc.'s ("Defendant" or "Ameriprise") Motion for Summary Judgment, and respectfully shows the Court as follows:

## I.
## SUMMARY

In this suit for breach of contract, Plaintiff has filed a Motion for Final Summary Judgment ("Plaintiff's Motion") and Brief in Support of same ("Plaintiff's Brief") which establish there is no genuine issue of material fact in this cause as to Plaintiff's perfection of its interest in the REIT at issue and the imposition of a duty upon Defendant to comply with the terms of the Control Agreement executed by Defendant's agent under Articles 8 and 9 of the Uniform Commercial Code, as adopted by the Texas Business and Commerce Code. *Docket No. 23, Brief at 4-10.* Plaintiff's Brief further establishes there is no genuine issue of material fact in this cause as to (1) the existence of a valid contract between the parties (*i.e.*, the Control Agreement); (2) Plaintiff's performance in relation to that contract; (3) Defendant's breach of the contract; and (4) Plaintiff's resulting damages. *Id., Brief at 10-25.*

Defendant filed its own Motion for Summary Judgment ("Defendant's Motion") and Brief in Support of same ("Defendant's Brief"), addressing only the issues of the existence of a valid contract and Plaintiff's alleged damages. *See generally Docket Nos. 25 and 26.* Defendant argues the Control Agreement signed by its financial advisor, Johnny Jordan ("Jordan"), does not constitute a valid contract because Jordan was not an agent of Defendant and did not possess actual or apparent authority to execute the Control Agreement. *Id.* In doing so, Defendant relies wholly upon the terms of an "Independent Advisor Business Franchise Agreement" (the "Franchise Agreement") between Defendant and Jordan, executed in March 2000. *Id.* Defendant would have this Court ignore, however, the day-to-day practice of Jordan's business as a financial advisor of

Defendant, as well as the extent of Defendant's involvement in same.  As demonstrated herein and in Plaintiff's Brief, it is Defendant's participation in, and control of, Jordan's business performance that rendered Jordan an agent of Defendant and conveyed upon Jordan the actual or, alternatively, apparent, authority to enter into the Control Agreement which is at the heart of Plaintiff's claims. *See Docket No. 23, Brief at 14-19.*  Such is the case regardless of the terms of the Franchise Agreement.

With regard to the element of Plaintiff's damages, the summary judgment evidence attached to Plaintiff's Appendix in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, and attached to Plaintiff's Appendix in Support of its Motion for Final Summary Judgment, shows that Defendant's failure to comply with the Control Agreement allowed the value of the REIT to be liquidated over time, and deprived Plaintiff of security in relation to the underlying loan.

Defendant's Motion should be denied, and Plaintiff's Motion granted, for the reasons identified above and more fully described below.  All documents and proof contained in Plaintiff's Appendix in Support of its Response to Defendant's Motion for Summary Judgment, filed this same day, are incorporated herein by reference for all purposes.  Capitalized terms not set forth herein shall have the same meaning assigned to them in Plaintiff's Brief.

## II.
## PROCEDURAL BACKGROUND

On December 30, 2009, Plaintiff and Defendant filed their cross-Motions for Summary Judgment on Plaintiff's cause of action for breach of contract in this matter.  *Docket Nos. 23 and 25.*  The legal and factual grounds on which Plaintiff relies in response and opposition to Defendant's Motion are set forth herein.

## III.
## FACTUAL BACKGROUND

The factual background of this matter, and the argument and authorities in support of Plaintiff's Motion, are set forth in detail in Plaintiff's Brief, which is incorporated herein by reference as if fully set forth.  *See generally Docket No. 23, Brief.*  In the interest of this Court's time, Plaintiff will not reiterate the factual background here.  Instead, Plaintiff would simply clarify selected points raised by Defendant in its Brief.  First, Defendant states that Jordan's relationship with Ameriprise was consummated by and through the Franchise Agreement in March 2000. Documents produced by Defendant in the course of discovery reflect that Jordan's relationship with Defendant far pre-dated the Franchise Agreement. App. at 5-12. Documents produced by Defendant as a part of Jordan's personnel file indicate that the relationship between Jordan and Defendant began in the late 1980s or early-1990s.  *Id.* One document even lists Jordan's "employment start date" with Defendant as July 13, 1989.  *Id.* at 12.  Because the relationship between Jordan and Defendant, and Defendant's resulting control of Jordan's performance as one of its financial advisors, should not be evaluated on the terms of the Franchise Agreement alone, the longstanding relationship reflected in the documents produced by Defendant is important.

Secondly, Defendant notes in its Brief that documents produced by the REIT's transfer agent, Bank of New York, indicate that the Barrow Family Partnership liquidated its interest in the REIT.  *Docket No. 26 at 5-6.*  Defendant further notes that the proceeds from liquidations between June 30, 2005 and May 28, 2006, did not go into the Account, but were made payable by check to the Barrow Family Partnership directly.  *Id. at 6.*  Concededly, that is what the Bank of New York records reflect.  It is worth noting, however, that dividends paid from the REIT were paid to the Barrow Family Partnership's money market account held by Defendant.  App. at 33-34.  Though the payment of these dividends predate the Control Agreement, the transfer of these funds evidences that Defendant was entirely capable of communicating with Bank of New York.  Thus, Defendant

could have made any number of efforts to comply with the terms of the Control Agreement, as it was bound to do.  *See id.*  It failed to do so, however.

**IV.**
**ARGUMENT AND AUTHORITIES**

This Court should deny Defendant's Motion for the same reasons it should grant Plaintiff's: (1) Johnny Jordan was an agent of Defendant with actual or, alternatively, apparent authority to act on Defendant's behalf with regard to the Control Agreement, and (2) Plaintiff sustained monetary damages as a result of Defendant's breach of the Control Agreement.

**A.      The Control Agreement was a valid contract because, as its agent, Jordan possessed authority to act on Defendant's behalf.**

The issue of whether Johnny Jordan possessed the authority - whether actual or apparent - to act on Defendant's behalf with regard to the Control Agreement will be determinative as to whether the Control Agreement constituted a binding contract which Defendant undisputedly breached.  In arguing that Jordan was not an agent of Ameriprise, Defendant relies solely on the existence of the Franchise Agreement (to which Plaintiff has objected) which describes Jordan as an "independent contractor." *See Docket No. 26 at 7-18*; *see also Plaintiff's Objection and Response to Defendant's Motion for Summary Judgment, filed contemporaneously herewith and incorporated herein by reference as if fully set forth.*  The Franchise Agreement alone is not determinative of the nature of Jordan's relationship with Defendant.  In fact, the case law cited by Defendant throughout its Brief acknowledges that to be the case.  An examination of not the Franchise Agreement, but Defendant's actual involvement in Jordan's business as one of its financial advisors, conclusively demonstrates that Jordan was indeed an agent of Defendant.

1.   Jordan is Defendant's agent because Defendant controlled the details of his work as financial advisor.

    a.   *A written contract is not determinative of the parties' relationship where there is evidence of control by the alleged principal.*

The vast majority of Defendant's Brief is devoted to case law in which an agency relationship was not found and which generally addresses the principles of agency. *See Docket No. 26 at 8-18 (internal citations omitted).* The principles cited in Defendant's Brief include the proposition that a written contract identifying a party as an independent contractor is determinative of the parties' relationship unless there is extrinsic evidence which indicates "the contract was subterfuge, that the hiring party exercised control in a manner inconsistent with the contract provisions, or if the written contract has been modified by a subsequent agreement, either express or implied." *Id. at 8 (internal citations omitted).* Plaintiff does not dispute this proposition of law. In many cases cited by Defendant, however, the party alleging the presence of an agency relationship presented no extrinsic evidence of control by the alleged principal. *See Am. Energy Serv., Inc. v. Union Pacific Resources Co.*, No. 01-98-01264-CV, 2001 WL 953736, at *5 (Tex. App. - Houston [1st Dist.] Aug. 16, 2001) (not designated for publication) (no evidence submitted to show contract was a subterfuge or exercise of control by alleged principal); *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345, 351 (5th Cir. 2001) (no evidence in record indicated exercise of control beyond written contract); *Ochoa v. J&H Truck Serv., Inc.*, No. Civ. A. 3:97-CV-1998G, 1999 WL 729252, at *3, (N.D. Tex. Sept. 15, 1999) (controlling facts undisputed); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 714 (Tex. App. - Fort Worth 2006, no pet. h.) (no reliance on extrinsic evidence); *Granger v. Tealstone Contractors, L.P.*, No. 05-04-00636-CV, 2005 WL 565098, at *2 (Tex. App. - Dallas March 11, 2005) (not designated for publication) (no reliance on extrinsic evidence); *Smith v. Foodmaker, Inc.*, 928 S.W.2d 683, 687 (Tex. App. - Fort Worth 1996, no pet. h.) (no summary judgment proof controverting franchise agreement presented); *Arguello v. Conoco,*

*Inc.*, 207 F.3d 803, 807-08 (5th Cir. 2000) (argument regarding agency based solely on terms of written contract, not extrinsic evidence).  That is simply not the case here.  Instead, the evidence in this case shows that the Franchise Agreement was subterfuge in that Defendant exercised control in a manner inconsistent with its terms. The Franchise Agreement's designation of Jordan as an "independent contractor" is not controlling in this matter as a result.

As the case law cited by Defendant outlines, a written contract which states the parties have an independent contractor relationship is not determinative of their actual relationship if there is extrinsic evidence of subterfuge, or if the alleged principal exercised control over the alleged agent in a manner inconsistent with the written contract. *See, e.g., Northwinds*, 258 F.3d at 351.  One may establish that a written contract was subterfuge by showing that the alleged principal exercised control over the details of the work performed by the alleged agent.  *See Ross v. Texas One Partnership*, 796 S.W.2d 206, 211 (Tex. App. - Dallas 1990, writ denied), *citing Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590 (Tex. 1964); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App. - Fort Worth 2009, pet. denied), *citing Newspapers, Inc.*, 380 S.W.2d at 590-92.  Indeed, courts have unequivocally held that the primary test in deciding whether a party is an independent contractor is whether the alleged principal possesses the right to control the details of the other's work.  *See, e.g., Newspapers, Inc.*, 380 S.W.2d at 590 ("The 'right to control' remains the supreme test and the 'exercise of control' necessarily presupposes a right to control which must be related to some agreement expressed or implied.").

> b.    *Ameriprise actually controlled the details of Jordan's work, thereby making the Franchise Agreement a subterfuge.*

The extrinsic evidence which demonstrates Defendant's control over the details of Jordan's work comes from the testimony of Andrew Ross ("Ross"), Ameriprise financial advisor, former compliance officer, and designated corporate representative.  As outlined in Plaintiff's Brief, Ross testified regarding the various manners in which Defendant exercised control over its "independent"

financial advisors' businesses. *Docket No. 23, Brief at 15-19, incorporated herein by reference as if fully set forth.* A right of control is analyzed in various ways under Texas and Fifth Circuit law. There are several factors which may be considered, among them being the time for which the alleged agent is employed; the independent nature of the alleged agent's business; the alleged principal's right to dictate the means and details of the process by which the alleged agent will accomplish an assigned task; and the alleged principal's right to give the alleged agent interim instructions that go beyond the power to order the work stopped or resumed, to inspect progress, or to make suggestions or recommendations which need not be followed. *See Ross*, 796 S.W.2d at 210; *Cardinal Health Solutions v. Valley Baptist Medical Ctr.*, 643 F.Supp.2d 883, 888-89 (S.D. Tex. 1981).

### (i)      Length of Jordan's employment and relationship with Defendant

With regard to the length of Jordan's relationship with Defendant, Ross testified that Jordan began working with Defendant in 1989. App. at 40, Depo. pp. 10-12. The personnel records Defendant produced in this cause confirm Ross's testimony. App. at 5-12. At his deposition, Ross explained that, in the late 1990s, the National Association of Securities Dealers ("NASD") became concerned with Defendant's practice of commingling financial advisors who were its employees with those who were supposedly acting as its independent contractors. App. at 40, Depo. pp. 11-13. In response to pressure from the NASD, Defendant began to physically divide its "employees" from its "independent contractors" by having the "independent contractors" sign franchise agreements and office in different suites (though not necessarily different buildings) from "employees." App. at 40-41, Depo. pp. 11-16. Prior to that time, Defendant's financial advisors were generally treated as its employees. App. at 40, Depo. pp. 10-11.

It would appear, then, that Defendant's scheme by which it physically separated its employees from its supposed independent contractors was simply "window dressing" in an attempt

to appease the NASD.  The compensation of the individuals Defendant designated as employees differed from those individuals it designated as independent contractors differed in that the employees were given a salary in addition to the commissions both classes received. App. at 41, Depo. p. 16. Additionally, independent contractors negotiated their own real estate leases.  *Id.* However, Defendant required both "employees" and "independent contractors" to attend training provided by Defendant, follow Defendant's policies dictating the details of their work, and were subject to the same restrictions on the products they were allowed to offer their customers.  App. at 44-48, Depo. pp. 28-47.  There were also no changes in Defendant's record keeping requirements among its employees and independent contractors from the time before Defendant started having financial advisors sign franchise agreements to after.  App. at 46, Depo. pp. 34-35.  Any differences in the level of control Defendant exerted over its employees as compared to its purported independent contractors was minimal.

   (ii) **Defendant's control of the details of Jordan's work and its instructions to its financial advisors in performing their work**

  Again, Plaintiff's Brief identifies numerous manners in which Defendant controlled the details of its independent financial advisors' work.  *Docket No. 23, Brief at 15-19, incorporated herein by reference as if fully set forth.*  For the sake of brevity, those items will not be restated here.  Still, there are a few additional items this Court should consider in light of the arguments presented in Defendant's Brief.

  In its Brief, Defendant references holdings of the United States District Court of the Southern District of Texas, Brownville Division; the Fort Worth Court of Appeals; and the Fifth Circuit in *Cardinal Health Solutions v. Valley Baptist Medical Ctr., Bell v. VPSI, Inc.*, and *Arguello v. Conoco, Inc.*,  respectively.  *See Docket No. 26 at 12-13*; *see also Cardinal*, 643 F.Supp.2d at 883;  *Bell*, 205 S.W.3d at 706; *Arguello*, 207 F.3d at 803.  All three of these cases focused only on the provisions of the written contract between the parties at issue.  *Cardinal*, 643 F.Supp.2d at 891-

93;  *Bell*, 205 S.W.3d at 714; *Arguello*, 207 F.3d at 807-08.  Though the contracts in those cases generally referenced the requirement that the alleged agents' comply with the purported principals' written policies, the parties alleging the existence of agency relationships in *Cardinal*, *Bell*, and *Arguello* did not present any evidence that would suggest that such policies went beyond setting only basic parameters that did not affect or control the details of the alleged agents' work or their exercise of judgment in performing the assigned tasks. *Id*.

Here, the extrinsic evidence conclusively establishes that Defendant did adopt practices which detailed the manner in which financial advisors were to perform their services and, perhaps more importantly, effectively replaced the judgment of financial advisors with Defendant's own. Again, the circumstances in this case which distinguish the present cause from *Cardinal*, *Bell*, and *Arguello*, and which show there is no genuine issue of material fact regarding Jordan's status as an agent of Defendant, are evidenced in Ross's testimony regarding Defendant's own policies, practices and procedures.  In its Brief, Defendant argues that no agency relationship existed between it and Jordan because it "had no right of control and could not prescribe the 'means and details' used by Jordan in fulfilling his duties…" *Docket No. 26 at 15.*  Defendant further argues it did not participate in Jordan's daily operations or give him interim instructions on how work should be completed.  *Id. at 14.*  Specifically, Defendant states, "Ameriprise would not dictate what security was suitable for a specific client, or what financial plan was appropriate for a client."  *Id.* According to Ross's testimony, Defendant did just that.

During the course of his deposition, Ross testified regarding how Defendant placed restrictions on the financial products its independent financial advisors could offer their clients. App. at 45, Depo. pp. 31-33.  He specified that even individuals considered to be Defendant's independent financial advisors were required to obtain special permission from Defendant in order to sell a product that was not under the American Express or Ameriprise umbrella. *Id.*  Ross went

on to explain that Defendant sometimes denied financial advisors' requests to sell non-American Express or non-Ameriprise products to their customers because Defendant deemed such products unnecessary:

> Q:   Were you ever aware of a circumstance where you requested permission from American Express to sell a product or service and it was denied?
>
> A:   Yes. Okay. Let me answer that in two ways. We were allowed to represent products that were not under the Ameriprise umbrella. We had to get signed a special form from Ameriprise as to why we needed to represent that product. So we would get a single-case agreement to represent other products. Now, there were some cases, and I don't remember any specific examples, but there were some cases where it was denied because it was not necessary.
>
> Q:   And when you say not necessary, was not necessary to service the client's needs?
>
> A:   Yes. We already had a product either directly through us or through some other arrangement that we had that could fairly represent the client's needs.

App. at 45, Depo. p. 32, ll. 6-23.

By restricting financial advisors' ability to recommend and sell products to their clients not because the products were considered risky or unreliable, but because Ameriprise deemed the products "not necessary" shows how Defendant substituted its own judgment for that of its financial advisors in performing financial planning services. A number of the cases cited by Defendant in its Brief addressed the issue of agency in a medical context.  *See Cardinal*, 643 F.Supp.2d at 883; *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F.Supp. 811 (S.D. Tex. 2008).  In those cases, the respective courts' determinations that no agency relationships existed hinged largely on the medical providers' retained right to exercise their own judgment in diagnosing, treating, or aiding in the treatment of patients. *See Cardinal*, 643 F.Supp.2d at 893; *Emtel, Inc.*, 583 F.Supp. at 838.  Here, however, the summary judgment evidence shows that Defendant developed policies and practices whereby it exercised control over, and restricted, financial advisors' judgment with regard to their work.  This

is clear in Ross's testimony that Defendant limited its financial advisors' abilities to determine what products would or would not be suitable for the financial advisors' clients.

Defendant's control over the judgment of its financial advisors, coupled with the other means of control outlined in Plaintiff's Brief, and the existence of policies and procedures adopted by Defendant which exceeded the scope of simple compliance with applicable laws or regulations, conclusively show that Defendant controlled the means and details of Jordan's work as its financial advisor.  *See Docket No. 23, Brief at 15-19*; *see also* App. at 52, Depo. pp. 58-61.  Such renders Jordan Defendant's agent - regardless of what the Franchise Agreement states.  *See Newspapers, Inc.*, 380 S.W.2d at 590; *Ross*, 796 S.W.2d at 211; *Farlow*, 284 S.W.3d at 911.

> 2.  <u>Defendant bestowed actual authority on Jordan, or alternatively, Jordan possessed apparent authority, to act on Defendant's behalf with regard to the Control Agreement.</u>

>> a.  *Jordan had actual authority to process requests for the pledge of accounts such as the REIT on Defendant's behalf.*

In its Brief, Defendant does not address the issue of the authority it expressly conveyed upon Jordan to process requests to pledge brokerage accounts such as the REIT as collateral to third parties.  *See generally Docket No. 26.*  Instead, Defendant makes the conclusory statement that it is clear Jordan lacked the requisite actual authority.  As described in detail in Plaintiff's Brief, the evidence in this case shows that the actual authority Defendant conferred upon Jordan in relation to documents such as the Control Agreement renders Ameriprise liable in this matter.  *See Docket No. 23, Brief at 15-18, incorporated herein by reference as if fully set forth.*

>> b.  *Alternatively, Jordan had apparent authority to process requests for the pledge of accounts such as the REIT on Defendant's behalf.*

>>> **(i)  Defendant's affirmative acts creating apparent authority**

Plaintiff does not dispute Defendant's assertion that it is the actions of the principal on which apparent authority is based.  *See Docket No. 26 at 16 (citations omitted).*  Plaintiff does dispute

Defendant's assertion that Ameriprise did nothing to cause a reasonable person to believe that Jordan possessed authority to act on its behalf with regard to the Control Agreement. As more fully detailed in Plaintiff's Brief, Ameriprise created a scheme under which it systematically required its "independent" financial advisors to present themselves in such a manner as to appear to be agents and representatives of Ameriprise. *See Docket No. 23, Brief at 18-19, incorporated herein by reference as if fully set forth*; *see also* App. at 44-50, 53-54. Defendant did so by requiring its financial advisors to utilize the Ameriprise and American Express trade names on all advertising, stationery, business cards, and other materials. App. at 44-50. Ameriprise further required that its financial advisors utilize its applications and forms in establishing client accounts. App. at 46, Depo. p. 36. This environment, affirmatively created by Defendant, led Plaintiff to reasonably believe that Jordan was authorized to act on Defendant's behalf in relation to the Control Agreement.

Plaintiff further disputes Defendant's statement in its Brief that, in believing Jordan had the requisite authority to act for Ameriprise in relation to the Control Agreement, Plaintiff relied only on Jordan's statements and "two documents given to it by the Partnership." *Docket No. 26 at 17 (emphasis added).* The two documents to which Defendant refers are the American Express Online Service and Transactions Group Account List and the CNL Investment Summary as of April 27, 2004. App. at 73-75, 77. While Plaintiff's representative, Wendy Fox, did not recall at her deposition whether these documents were sent to her directly, both bear facsimile transmission statements which indicate they originated from Jordan. App. at 73-75, 77; App. at 107, Depo. pp. 110-112. Additionally, Ross testified that clients such as the Barrow Family Partnership do not have access to the Online Service and Transactions Group Account List to his knowledge. App. at 63, Depo. pp. 103-104. Instead, it appears that document is accessible only by financial advisors. *Id.*

Plaintiff's receipt of the Online Service and Transactions Group Account List is significant because (1) it was a document generated by Defendant, and (2) it indicates that the REIT is held and managed by Defendant by listing the REIT among the Barrow Family Partnership's Ameriprise accounts and containing detailed information regarding the REIT. App. at 73-75.   In the context created by Ameriprise in which it so heavily cloaked its financial advisors with the Ameriprise trade dress, the Online Service and Transactions Group Account List reasonably led Plaintiff to believe that not only was Jordan an authorized agent of Defendant with regard to the Control Agreement, but that the REIT was being supervised by Defendant.

> (ii)     **Distinctions between the present matter and case law relied upon by Defendant**

Defendant likens this case to that of *Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007), in which the Texas Supreme Court declined to find an agency relationship between a mortgage broker and a lender.   *Docket No. 26 at 16.*   A brief factual history of *Gaines* is helpful in identifying the distinctions between that case and the present matter. In *Gaines*, the plaintiff-client Roger Kelly ("Kelly") entered into an agreement with Robert Thompson ("Thompson"), acting on behalf of Commercial Realty Advisors, Inc., to assist him in obtaining financing for the refinancing and development of real property. *Gaines*, 235 S.W.3d at 181.   Thompson then approached lender Southwest Guaranty Mortgage Corp. ("Southwest") about obtaining a loan for Kelly. *Id.*   Southwest provided Thompson with the pertinent paperwork, and Thompson forwarded the paperwork to Kelly for completion.   *Id.*   Kelly completed the paperwork and returned it to Thompson, who then forwarded it to Southwest.   *Id.*   Though Thompson allegedly told Kelly the loan was a "done deal," funding never occurred and litigation ensued.   *Id.* at 181-82.   The question then became whether Thompson was an agent of Southwest and whether Thompson's comment could be attributable to Southwest.   *Id.* at 182.

The *Gaines* Court found that Thompson was not an agent of Southwest, and that he acted as a mere middleman between Kelly and Southwest. *Gaines*, 235 S.W.3d at 183. In doing so, the Court cited a string of case law establishing that where a party only acts as a "matchmaker" or deals with two parties at arm's length, he is not an agent of either party. *Id. (citations omitted)*. Here, Jordan did not simply act as a matchmaker between Defendant and either the Barrow Family Partnership or Plaintiff. Certainly, Jordan did not deal with Defendant at an arm's length so as to render his relationship with Defendant as tenuous as Thompson's relationship with Southwest in *Gaines*. Unlike in *Gaines*, where there was no suggestion that Thompson bore any previous relationship with Southwest, the evidence in this case shows that Jordan's relationship with Defendant dated as far back as 1989. App. at 5-12; App. at 40, Depo. pp. 10-12. Kelly's belief in *Gaines* that Thompson was an authorized agent of Southwest was not reasonable, where Plaintiff's belief that Jordan was an authorized agent of Defendant was. With regard to the scope of the matter with which Jordan was entrusted, summary judgment evidence shows that Defendant dictated that requests to collateralize securities such as the REIT go through clients' financial advisors. App. at 119-122; App. at 129, Depo. p. 21. Defendant entrusted Jordan with the responsibility of processing of requests to pledge such accounts. *Id.* Therefore, his actions with regard to the Control Agreement were within the scope of his apparent authority.

The holding in *Gaines*, upon which Defendant relies in support of its Motion for Summary Judgment, is distinguishable from the present matter. Considering both Ameriprise's system by which it holds its financial advisors out as its authorized agents and Ameriprise's affirmative acts identifying the REIT as among the Barrow Family Partnership's Ameriprise accounts, Plaintiff's belief that Jordan could act on Defendant's behalf was reasonable and prudent. Accordingly, Defendant should be deemed bound by the terms of the Control Agreement, and found liable for its breach of same.

B.    **Plaintiff sustained monetary damages due to Defendant's breach of the Control Agreement.**

It is undisputed that Defendant failed to comply with the terms of the Control Agreement by failing to (1) send Plaintiff photocopies of any and all statements, reports, and other information relating to the REIT, and (2) ensure that the REIT and its proceeds were not paid to anyone other than Plaintiff. *See* App. at 151.  Defendant's failure to comply with the Control Agreement allowed the value of the REIT to be liquidated over time, and deprived Plaintiff of security in relation to the underlying loan.

Defendant briefly addresses the circumstances of this case in relation to the Uniform Commercial Code ("UCC"), as adopted by the Texas Business and Commerce Code.  *Docket No. 26 at 19.*  In response, Plaintiff hereby incorporates the detailed discussion of Defendant's duties and obligations in relation to the Control Agreement pursuant to the UCC which is set forth in Plaintiff's Brief.  *Docket No. 23, Brief at 4-10.*  Even outside of the statutory duties imposed upon Defendant by the UCC, Defendant was obligated to comply with the terms of the Control Agreement under contract law.  *See id. at 10-25.*

Defendant also argues in its Brief that Plaintiff sustained no damages as the result of its breach of the Control Agreement because no funds were funneled through the Account after the date of the Control Agreement.  *Docket No. 26 at 19.*  Thus, Defendant argues, Plaintiff's security in the Account was worthless.  *Id.*  Defendant focuses on the maintenance of the REIT by the Bank of New York, stating that Ameriprise could only control security entitlements it held and maintained. *Id. at 19-20.*  In making this argument, Defendant essentially claims ignorance of a REIT of which it, in actuality, was receiving periodic updates from the transfer agent as to its proceeds and then communicating that information to the Barrow Family Partnership directly. *See* App. at 153-167. Even if Defendant could not directly control the disbursement of funds from the REIT directly, as it argues in its Brief, Defendant was still entirely capable of discharging its duties under the Control

Agreement by notifying the Bank of New York of Plaintiff's security interest in the REIT to satisfy the obligation it incurred.

With regard to the loss resulting from Defendant's breach of the Control Agreement, both Ameriprise and Bank of New York records reflect that at least $381,424.00 was wrongfully liquidated from the REIT between the time of Johnny Jordan's execution of the Control Agreement and the Barrow Family Partnership's default of the Note.  *See* App. at 153-160 (estimating the REIT's value at $400,000.00 as of August 15, 2004); *see also* App. at 161-167 (reflecting depletion of REIT's value as of May 14, 2006); *see also* App. at 33-35 (reflecting liquidation of $381,424.00 from the REIT between July 15, 2005 and April 28, 2006).  Thus, if the security entitlement in which Plaintiff held a security interest was worthless, as Defendant argues in its Brief, such was the case because Defendant failed to honor its obligations under the Control Agreement.

Defendant cannot disclaim liability for its breach of the Control Agreement by arguing that its breach effectively rendered the secured asset worthless.  Had Defendant met its contractual obligations under the Control Agreement, the REIT would have retained its value and the Bank would have been able to foreclose its security interest in the REIT so as to collect an amount equal to the remaining principal of the Note.  Instead, it is Defendant's breach of the Control Agreement which has resulted in there no longer being an account to collateralize.  Plaintiff has been damaged in the amount of $144,350.78, plus accrued interest, and has incurred attorney's fees as a result.[1]

**V.**
**PRAYER**

**WHEREFORE PREMISES CONSIDERED**, Plaintiff Texas Capital Bank, N.A. respectfully prays that the Court enter an Order sustaining its objection to Defendant's summary

---

[1] Plaintiff incorporates herein by reference the Affidavits of Wendy Fox and Jennifer L. Owen attached to Plaintiff's Appendix in Support of its Motion for Final Judgment, filed December 20, 2009, as Exhibits A and R, respectively. *Docket No. 24 at 1-4, 258-260.*  The Affidavit of Wendy Fox outlines the amount of Plaintiff's damages and authenticates evidence Plaintiff cites and incorporates into this Brief as business records of Plaintiff.  *Docket No. 24 at 1-4.*  The Affidavit of Jennifer L. Owen lists the attorney's fees incurred by Plaintiff in this cause as of the date of Plaintiff's Motion. *Docket No. 24 at 258-260.*

judgment evidence and denying Defendant's Motion for Summary Judgment.  Plaintiff further prays that the Court enter an Order granting Plaintiff's own Motion for Final Summary Judgment and awarding Plaintiff damages in the amount of $144,350.78, representing the outstanding principal balance on the underlying loan in relation to this cause, as well as accrued interest to date, plus Plaintiff's reasonable attorney's fees.  Plaintiff further requests that this Court award it such other and further relief, at law or in equity, to which it may show itself to be justly entitled.

Respectfully submitted,

HIGIER ALLEN & LAUTIN, P.C.

By:      /s/ Stacy R. Welch_____
Jennifer L. Owen
State Bar No. 15369050
Stacy R. Welch
State Bar No. 24033321

5057 Keller Springs Road, Suite 600
Addison, Texas  75001
Telephone: (972) 716-1888
Telecopy:  (972) 716-1899

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of January, 2010, a true and correct copy of the foregoing was sent via ECF notification and U.S. Certified Mail, Return Receipt Requested to:

Cole B. Ramey
John B. Shipp
Crouch & Ramey, L.L.P.
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202

Thomas A. Roberts
Larry E. Mobley
Barrasso Usdin Kupperman Freeman & Sarver, LLC
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112

 /s/ Stacy R. Welch_____
Stacy R. Welch
